KERLIN v. KENNY, ADMINISTRATOR, ET AL.

[No. 19,067. Filed October 28, 1958. Rehearing denied November 25, 1958. Transfer denied January 14, 1959, with opinion 155 N. E. 2d 389.]

*Vaughan & Vaughan, James E. Vaughan,* and *Charles L. Vaughan,* all of Lafayette, for appellant.

*John B. Hudson* and *Harry P. Schultz,* both of Lafayette, for appellees.

KELLEY, J.—On January 1, 1954, the Probate Code of Indiana became effective. On January 5, 1954, the decedent, Pierre I. Kenny, died intestate. His estate is being administered upon in the Tippecanoe Circuit Court and the appellee, Charles I. Kenny, is the administrator of said estate.

Said decedent had a son, E. Russell Kenny, who died on December 19, 1937, leaving surviving his widow, Gladys Kenny, and a daughter, the appellant, who was born on April 6, 1937. On June 16, 1939, said widow, Gladys Kenny, married Harold Kirkpatrick, and on February 21, 1947, said Harold Kirkpatrick, the said Gladys Kenny Kirkpatrick, the natural mother of appellant, joining in the petition therefor by giving her written consent thereto, adopted the appellant and her name was changed to Eileen Lou Kirkpatrick. On May 2, 1954, the latter married one Homer Kerlin.

Said decedent left surviving him his four children, the individually named appellees, and the appellant, his granddaughter. The appellee administrator filed his final account in said estate showing charges and credits, naming the four appellees as the sole and only surviving heirs at law of decedent, and that the said decedent was survived by the appellant "a natural granddaughter" and that she was adopted prior to the death of the decedent. The account prayed for settlement, heirship determined, and distribution ordered. Appellant thereafter filed her verified petition for determination of heirship and that her "interests in said estate as the adopted daughter of a deceased son be established." Said petition and said final account were set for hearing on January 21, 1957.

On said latter mentioned date appellant filed her verified objections to said final report, alleging therein, in substance, that prior to the death of decedent, the

latter and his children named in said final report as his heirs-at-law "entered into a family settlement agreement" wtih appellant "by the terms of which" the appellant "was to receive her father's share of the net amount available for distribution . . . along with the other heirs." Distribution pursuant to said "family settlement agreement" was prayed for.

Upon submission, the court found against appellant upon her petition to determine heirship and overruled her objections to the final report, and adjudged that she is not an heir-at-law of the decedent and not entitled to any distributive share of the estate of said decedent.

Appellant contends that the decision of the court is contrary to law because (1) she inherited directly from her grandparent, the decedent, and not through or as an heir of her natural father; and (2) that the undisputed evidence established a family settlement agreement whereby she was to share in decedent's estate equally with his said children.

It seems logical to take for first consideration the second of said contentions for if the appellant is entitled to share in the estate by virtue of efficacious agreement, an estimation of pertinent statutes governing her asserted right of inheritance becomes unnecessary.

The only witness called to testify on the issue raised by appellant's objections to the final report was appellee, Charles I. Kenny. Harold Kirkpatrick, the adoptive father of appellant, was questioned during his general testimony concerning an agreement with the individual appellees relative to distribution of decedent's estate and he said he had made an agreement with said appellees for and on behalf of appellant. No further evidence

as to the nature, details, time, terms, parties, and place of such agreement was given by said witness. It remains then, that said Charle I. Kenny gave the only evidence concerning such alleged agreement.

The pertinent portions of the testimony of said Charles I. Kenny having any bearing on the issue of the alleged agreement are now set forth in *haec verba* from the record:

"Q. What agreement, if any, did you have with Eileen Kerlin, then Eileen Kirkpatrick with regard to the distribution of money of Pierre Kenny in his lifetime and with regard to the distribution of his estate?

"A. I didn't have any agreement, the whole family had an agreement each one of the children was to get five thousand dollars and I was appointed Guardian after that was taken over; I wasn't even Guardian then, I was just a member of the family.

"Q. Did he sign the check for five thousand dollars against that account, or did he not?

"A. He did.

"Q. For each of the children?

"A. Yes.

"Q. And Eileen got five thousand too?

"A. That is right.

. . .

"Q. Do you recall at that time when that five thousand was issued to each one of the children, that it was agreed between the children and Eileen, that the balance left at his death, after the payment of debts, would be distributed share and share alike?

"A. I can't answer that 'yes' or 'no.'

"Q. Go ahead and answer the best you can.

"A. It was the supposition that Dad wasn't capable of making a will, *so there wasn't anything said about share and share alike,* it was just

a supposition that had to be, if there wasn't any will.

. . .

"Q. I hand you herewith Objector's Exhibit No. 1, and ask you to read this letter and see if that refreshes your memory any on the situation?

"A. Yes.

"Q. Now can you tell the Court then just what the situation was at that time?

"A. Well, if I remember correctly we were here in court and my brother was here, I don't know whether my sister was here or not, and I was in here and my father did sign a check for five thousand dollars to each one of the children with my exception, excluding myself, *but to my knowledge there wasn't at that time anything said about how the rest of the estate would be distributed.*

. . .

"Q. And Eileen got her father's share, or a check for five thousand dollars?

"A. That is a fact.

"Q. Is it a fact at that time it was agreed your father was not in shape to make a will?

"A. Yes.

"Q. At the time of his death *you knew* he was to die without a will and his estate was to be divided equally *among you* on the theory of share and share alike at that time?

"A. Yes."

*Cross-Examination*

"Q. At the time of the conversation had that you refer to, that was at the time that you were appointed, or prior to the time you was appointed Guardian of your father?

"A. Yes.

"Q. And all of your brothers and sisters were not in court at that time?

"A. To the best of my knowledge they weren't.

"Q. And about the only thing then you recall about

it was the fact that prior to the appointment of the Guardian, your father issued four checks for five thousand dollars each to your sisters and your brother and to Russell's daughter?

"A. Yes."

. . .

### Re-Direct Examination

"Q. Charlie, just one thing, however these girls that were not in court at that time did accept the five thousand dollars?

"A. O yes; it was pretty well agreed, it was a family affair, and I think that my father's wish was to divide up his estate at that time."

### Re-Cross Examination

"Q. The facts are, it was anticipated by reason of the infirmities of age of your father and his mental condition resulting from the infirmities of age, he might be induced to make some unequitable distribution of his money and it was mutually agreed by the children that it would be in the best interest of the father that a Guardian be appointed, is that right?

"A. That's right.

"Q. But distribution was made before the Guardian was appointed, that right?

"A. Yes.

"Q. It was on the same day, was it not?

"A. Yes.

"Q. The fact of the matter is, not all the children were here in court, is that right?

"A. That's right."

(Note: Italics supplied.)

It seems clear that the quoted evidence is of such dubious nature, so clouded and lacking in definiteness, and so meagre in supplying the essential elements of the pleaded contract, that we would be wholly unwarranted to say that the conclu-

sion of the court thereon is contrary to law. An enforceable contract must be predicated and grounded upon something more than a supposition. There is no evidence here appearing that the living children of the decedent made any agreement of any kind with appellant or that any person duly authorized by them made any such agreement in their behalf. For all that appears from said evidence it cannot be said that said children of the decedent ever knew of any such agreement. The time and date of the alleged agreement is not shown. One question attempts to fix the time as that when the five thousand dollars was paid to appellees and appellant but there is a total failure of evidence to show a contract of any kind at that time. The witness, Kenny, appellant's own witness, said that there wasn't anything said about how the rest of the estate would be distributed and that there "wasn't anything said about share and share alike." That evidence is undisputed and was made by appellant's own witness. In our opinion said evidence fails to establish the contract alleged by appellant.

In the consideration of appellant's first contention, we must initially inquire as to the provisions of section 208 of the Probate Code (Acts 1953, ch. 112, p. 295, Burns', Sec. 6-208, 1953 Replacement) since it is now definitely settled by our Supreme Court that the intestate succession rights of heirs to the property and estates of those becoming deceased intestate on or subsequent to the effective date of the Probate Code (January 1, 1954) are determined by such Code. *Scott* v. *Scott, Admrx. et al.* (1958), 238 Ind. 474, 150 N. E. 2d 740.

Appellant was adopted during her minority and, consequently, the provisions of subsection (a) of said

Section 208 of said Code are applicable to her status. Said subsection, including only the pertinent words and phrases thereof, provides:

"For the purpose of inheritance to . . . a child legally adopted during his minority, such child shall be treated the same as if he were the natural child of his adopting parents, and he shall cease to be treated as the child of his natural parents . . . for purposes of intestate succession: . . ." (Acts 1953, ch. 112, Sec. 208(a), p. 295; Burns', Sec. 6-208(a), 1953 Replacement.)

It seems clear from the language employed by the Legislature in said subsection, and the manner of statement therof, that for the purposes of intestate succession the blood line between a child adopted during its minority and its natural relatives is completely severed, except under the conditions found in the proviso to said subsection. First, the subsection contains a positive mandate that the adopted child *shall be treated* as the *natural child* of the adoptors; and, second, it contains an equally positive desist against treating the adopted child as the child of its natural parents. The word "treated", as here used, seems to be synonymous with such words as "considered", "regarded", "dealt with", etc.

The statute, as drawn and worded, leaves no discernible opening for conditional interpretation. In effect, it provides that when a minor child is adopted it is no longer the child of or in the blood line of its natural parents for the purpose of any possibility of intestate inheritance. The natural ties of affection and interest between the adopted minor child and its blood relatives are not and, of course, cannot be affected by the statute. But for the purpose of intestate succession the child is freed from its former blood relationship status and is established in a new status as a member

of a new family with full standing as one of its blood. Other than the conditions provided in the proviso to said subsection and the fact that the child must be "legally" adopted, no observable way to avoid the declared status of the minor adopted child is found.

If, then, it be considered, as under the cited statute it apparently must be, that for the purpose of intestate inheritance, appellant, on the date of the death of the decedent, was not a child of the decedent's son, E. Russell Kenny, she could in no way now known stand to inherit from the intestate decedent. To hold, as appellant urges, that the debarring provisions of said subsection 208(a) extend only to her right of intestate inheritance from or through her natural parents and do not preclude her from inheriting "directly" from the decedent, as his natural granddaughter, would be, in view of our stated construction of said subsection, untenable and, in our opinion, would amount to a distortion of the evident legislative purpose.

We have encountered considerable difficulty in comprehending appellant's presentation of her proposal that she inherits "directly" from her grandfather and not "through the deceased parent." However, it seems to be immaterial in the light of our announced interpretation of said statute. If she does not stand in the blood line of the deceased ancestor, for purposes of intestate succession, it makes no difference whether she claims "directly" from the decedent or "through her deceased parent." As a stranger to the blood, she possesses no right of intestate inheritance.

Appellant cites and relies upon the case of *In Re Darling* (1916), 173 Cal. 221, 159 Pac. 606, but the statute construed in that case was dissimilar to the subsection 208(a) here involved, and possesses no weight as persuasive authority.

Appellant also advances the proposal that the last sentence in section 7 of ch. 146, Acts 1941 (Sec. 3-121, Burns' 1946 Replacement), reading as follows:

". . . nothing in this act . . . shall be construed to prevent a legally adopted person from inheriting property from his or her natural parent or other kind,"

remains in force and effect and it "makes no attempt to affect the rights of an adopted child to inherit from its natural parent." That, therefore, it and said subsection 208(a) of the Probate Code "are in apparent conflict" and should be reconciled so as not to destroy "rights of inheritance given under the prior adoption statutes." This contention was answered, we think, adversely to appellant, in the recent case of *Scott* v. *Scott, Admrx. et al., supra,* wherein the court, speaking of the same parts of the several statutes above referred to, said: ". . . if these two statutes are repugnant . . . the later expression of the legislature controls and repeals the former act to the extent of the repugnancy."

Lastly, appellant makes a strong plea that the right of a child to inherit from its grandparent should not be affected by the acts of its natural parents and that to deny such right of inheritance would give "synthetic heirship priority over natural heirship, contrary to divine right of inheritance by right of blood." These suggestions are of course suitable for legislative consideration but they are impotent to effectual judicial amendment of the apparent purpose of the statute. In reality, appellant pleads for duality of heirship. She seeks an unequal inheritance position with decedent's own children. Under her proposal she would be enabled to inherit from her natural relatives, including the grandfather, from her adopting parents, and ap-

parently from the latter's collateral relatives. (See *Scott* v. *Scott, Admrx. et al., supra.*) The natural children of the decedent, however, could inherit only from decedent.

In view of the possible far reaching effects hereof, we think it proper to emphasize that we now deal only and solely with the precise individual problem and circumstances at hand arising within the isolated realm of intestate succession.

Perceiving no demonstrated error, the judgment appealed from is affirmed.

NOTE.—Reported in 153 N. E. 2d 607.

Transfer denied 155 N. E. 2d 389.